**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| CINCINNATI INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:24-cv-00321-TWP-MKK |
| | ) | |
| LOST RUN FARM COMMUNITY | ) | |
| ASSOCIATION, INC., | ) | |
| ARMOUR PROPERTY MANAGEMENT, LLC, | ) | |
| VINCENT KROON, | ) | |
| BEN WHEAT, | ) | |
| SCOTT BRUNS, | ) | |
| ASHLEE WHEAT, | ) | |
| EDWARD KOWLOWITZ, | ) | |
| REBECCA KIELL, | ) | |
| JOHN GARCIA, | ) | |
| MARY KAY GARCIA, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| SCOTT BRUNS, | ) | |
| ASHLEE WHEAT, | ) | |
| REBECCA KIELL, | ) | |
| LOST RUN FARM COMMUNITY | ) | |
| ASSOCIATION, INC., | ) | |
| EDWARD KOWLOWITZ, | ) | |
| VINCENT KROON, | ) | |
| BEN WHEAT, | ) | |
| | ) | |
| Counter Claimants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CINCINNATI INSURANCE COMPANY, | ) | |
| | ) | |
| Counter Defendant. | ) | |

**<u>ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT</u>**

This matter is before the Court on the parties' cross motions for summary judgment. Plaintiff/Counter Defendant Cincinnati Insurance Company ("Cincinnati") filed a Motion for Summary Judgment (Filing No. 50); Defendants/Counter Claimants Lost Run Farm Community Association, Inc. ("Lost Run Farm"), Vincent Kroon, Ben Wheat, Scott Bruns, Ashlee Wheat, Edward Kowlowitz, and Rebecca Kiell (collectively, the "Lost Run Defendants") filed a Cross Motion for Summary Judgement (Filing No. 55); and Defendant Armour Property Management, LLC ("Armour") filed a Response to Plaintiff's Motion For Summary Judgment and Cross-Motion for Summary Judgment (Filing No. 58). Cincinnati initiated this action seeking a declaratory judgment in its favor stating that it had no duty to defend or indemnify the Lost Run Defendants or Armour for claims filed against them in state court by Defendants John Garcia and Mary Kay Garcia (the "Garcias") (Filing No. 1). For the following reasons, Cincinnati's Motion is **granted**, and the Lost Run Defendants' and Armour's Motions are **denied**.

## I.     BACKGROUND

This insurance coverage dispute surrounds an underlying state court lawsuit between the Garcia's and their homeowner's association—Defendants Lost Run Farm Community Association and individual members of the association's board (Vincent Kroon, Ben Wheat, Scott Bruns, Ashlee Wheat, Edward Kowlowitz, and Rebecca Kiell)—and Defendant Armour, the property management company for Lost Run Farm. The underlying lawsuit alleges discrimination against John Garcia based on his race and national origin, and against Mary Kay Garcia based on an alleged disability. All parties have moved for summary judgment, agreeing that the material facts recited below, are not in dispute.

**A.**    <u>**Facts Leading to Underlying Lawsuit**</u>

The Garcias are husband and wife who purchased Lot 17 of the Lost Run Farm Development located in Zionsville, Indiana on or about January 11, 2019 (<u>Filing No. 52-1 at 3</u>). Lot 17 was vacant, unimproved land. Any individual who owns a lot in the Lost Run Farm Development is a member of the Lost Run Farm Association. *Id*. The Association has a Board of Directors (the "Board") which consists of members of the Association. *Id*.

The Garcias began planning to build their home on the lot but received multiple complaints and notices of covenant violations prior to beginning construction. *Id*. at 4. On December 11, 2019, the Garcias submitted preliminary drawings to the Board. *Id*. On November 19, 2020, the Garcias submitted a formal construction application and delivered the application, deposit, and all required exterior material samples to the Board. *Id*. The Garcias also provided various plans to the Board via email. *Id*. On January 4, 2021, the Garcias received an approval letter from the Board for their construction application and landscape plan, with three exceptions regarding the fence, cultured stone, and the removal of a walnut tree. *Id*.

The Garcias engaged in communications with the Board to reach a compromise regarding the aspects of their application and plan that the Board did not approve. *Id*. at 5. Specifically, the Garcias communicated to the Board that they needed a fence to contain their dogs given Mary Kay Garcia's disability and the steepness of a 27-foot hill on the property. *Id*. However, the Board refused to allow any type of fence denying the Garcias' request for an accommodation for Mary Kay Garcia's disability. *Id*. at 6.

On July 15, 2021, the Garcias began construction on their home. *Id*. The next day, the Board and Armour, the property management company for Lost Run Farm, immediately requested that the Garcias stop all construction and relocate their approved driveway. *Id*. The Board and Armour

threatened to seek an injunction to halt the Garcias' construction efforts even though the driveway location had been previously approved. *Id*.

In December 2021, Armour called the Garcias to revoke their landscape plan and said that they would need to resubmit new plans under new requirements. *Id*. Armour required the Garcias to build large boulder walls and install a continuous row of trees across the entire backyard, which significantly increased construction costs. *Id*.

On February 23, 2022, the Garcias received a Notice of Noncompliance that required them to reapply with a new landscape plan, subject to the Board's approval. *Id*. On April 20, 2022, the Garcias submitted a revised landscape plan for approval. *Id*. On May 18, 2022, the Garcias received a new requirement that large stone planter beds were needed to accommodate trees near the pool. *Id*. at 5.

That same day, May 18, 2022, the Garcias withdrew their request for approval and informed Armour and the Board that they planned to work off the original approved landscape plan. On June 3, 2022, Armour and the Board rejected the previously withdrawn landscape plan and ignored the Garcias request to work off the original. *Id*.

That same day, the Garcias received yet another list of new requirements. Sod had to be fescue rather than the standard 85% Bluegrass Annual Rye mix; and Ozark Mountain Stone was required for all outcroppings even though that stone did not match the modern rustic style of the Garcias' residence. *Id*. In addition, the Garcias were informed that they must sod 100% of the property, even though others in the Lost Run Farm Development had used seed and straw. *Id*. Finally, the Board said that fencing around mechanical equipment was not allowed, even though others have fencing, and the covenants allow for fencing. *Id*.

4

On June 26, 2022, Armour and the Board demanded the Garcias submit another landscape plan. The Garcias complied with the demand, but Armour and the Board rejected the plan on September 7, 2022, claiming the plan was not in compliance with the covenants of the Lost Run Farm Development. *Id*. at 5–6.

**B.    Procedural History of Underlying Lawsuit**

Lost Run Farm filed suit in state court on October 21, 2022, against the Garcias to enforce the homeowners' association's covenants and by-laws that the Garcias allegedly violated (the "Underlying Lawsuit") (Filing No. 51 at 6). Lost Run Farm filed an amended complaint on November 14, 2022. The Garcias then filed counterclaims against Lost Run Farm and the individual Defendants listed in this case. *Id*.

On August 24, 2023, the Garcias were granted leave to file an amended counterclaim and third-party claims (the "Amended Counterclaim") against Armour and the Lost Run Farm Defendants. *Id*. The Amended Counterclaim asserted violations of the Federal Fair Housing Act, the Indiana Fair Housing Act, and the Civil Rights Act of 1866, as well as claims for intentional infliction of emotional distress, breach of fiduciary duty, breach of the duty of loyalty, breach of the duty to act in good faith, enforcement of restrictive covenants, breach of contract, and declaratory judgment. *Id*.

Armour and the Lost Run Farm Defendants each filed motions to dismiss but the state court denied those motions on January 23, 2024. *Id*. at 7. Armour and the Lost Run Farm Defendants then filed answers to the Amended Counterclaim on March 4, 2024, and March 15, 2024. *Id*.

On September 23, 2024, the Garcias were granted leave to file a second amended counterclaim and third-party complaint (the "Second Amended Counterclaim"), which advanced claims including allegations of violation of the Indiana Fair Housing Act, intentional infliction of

emotional distress, enforcement of restrictive covenants, breach of contract, abuse of process, frivolous claims, and declaratory judgment. *Id*.

On October 31, 2024, Armour and the Lost Run Defendants, respectively filed a motion to dismiss and a partial motion to dismiss the Second Amended Counterclaim. *Id*. On February 3, 2025, the state court dismissed all the Garcias' counterclaims except for breach of contract and declaratory judgment. *Id*. On October 14, 2025, the state court entered final judgment in favor of Lost Run Farm and denied all other claims. *See* Final Judgment Order, *Lost Run Farm Community Association, Inc. v. John C. Garcia et. al*, Cause No. 06D01-2210-PL-001319 (Boone Super. Ct. Oct. 14, 2025).[1]

**C.    The Insurance Policies**

Cincinnati issued a Commercial Policy (the "Policy") to Lost Run Farm and Armour, which was continually renewed and effective during the events pertaining to this case (Filing No. 51 at 8–9). The Policy contained two parts each providing different forms of coverage—the Commercial General Liability ("CGL") coverage and the Wrongful Acts coverage. The relevant terms of the CGL coverage of the Policy are as follows:

**SECTION I – COVERAGES**

**COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1. Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.

---

[1] A motion to correct errors remains pending in the Underlying state court action. See *Lost Run Farm Community Association, Inc. v. John C. Garcia et. al*, Cause No. 06D01-2210-PL-001319, last visited January 5, 2026.

b. This insurance applies to "bodily injury" and "property damage" only if:
>    (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";
>    (2) The "bodily injury" or "property damage" occurs during the policy period.

(Filing No. 52-4 at 3).

The CGL also contained the following exclusions:

**2. Exclusions**

This insurance does not apply to:

**a. Expected or Intended Injury**
"Bodily injury" or "property damage" which may reasonably be expected to result from the intentional or criminal acts of the insured or which is in fact expected or intended by the insured, even if the injury or damage is of a different degree or type than actually expected or intended. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**m. Damage to Impaired Property or Property Not Physically Injured**
"Property damage" to "impaired property" or property that has not been physically injured, arising out of:
>    (1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or
>    (2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms. This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

*Id*. at 4, 8.

The CGL contained the following definitions:

**SECTION V – DEFINITIONS**

4. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

16. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

20. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, "electronic data" is not tangible property.

*Id*. at 18, 21, 22.

The Policy also contained a Wrongful Acts Coverage Part which stated in relevant part:

## SECTION I – COVERAGE

### 1. Insuring Agreement

a. We will pay those sums that the insured becomes legally obligated to pay as "damages" because of a "wrongful act". We will have the right and duty to defend the insured against any "suit" seeking those "damages". However, we will have no duty to defend the insured against any "suit" seeking "damages" to which this insurance does not apply. We may, at our discretion, investigate any incident that may lead to a "claim" or "suit" and settle any "claim" or "suit" that may result.
   (2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements.

b. This insurance applies to a "wrongful act" only if:
   (1) The "wrongful act" takes place in the "coverage territory"; and
   (2) The "wrongful act" occurs during the policy period;

*Id*. at 35.

The Wrongful Acts Coverage also contained the following exclusions:

### 3. Exclusions

This insurance does not apply to any liability based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving:

### c. Bodily Injury, Personal Injury or Property Damage

Any actual or alleged:
   (1) Bodily injury, sickness, disease, or death of any person, assault, battery, mental anguish, or emotional distress;
   (2) "Property damage", including but not limited to physical injury, loss of or loss of use of currency or any negotiable or non-negotiable instruments or contracts representing money;

8

(3) Invasion of privacy, wrongful entry, eviction, false arrest, false imprisonment, false detention, abuse of process, malicious prosecution, libel, slander, defamation, or disparaging of a person's or organization's goods, products or services; or

(4) Interference with or damage to business reputation.

**d. Breach of Contract**

Breach of contract.

**g. Dishonest, Criminal or Malicious Acts**

Any insured or any person for whose actions an insured is legally responsible, committing any deliberately fraudulent, dishonest, criminal or malicious act or omission, or willful or reckless violation of any statute, rule, regulation, agreement, or judicial or regulatory order.

**t. Violation of Civil Rights**

Violation of any civil rights law whether Federal or State or local ordinance, including but not limited to discrimination on account of race, religion, sex, or age.

*Id*. at 35–37.

Finally, the Wrongful Acts Coverage contained the following definitions:

**SECTION V – DEFINITIONS**

1. "Claim" means a demand received by an insured for money, including the service of a "suit".

4. "Damages" means the total amount of monetary damages that the insured become legally obligated to pay on account of all "claims" for a "wrongful act" with respect to which coverage hereunder applies, including damages, judgments, and settlements.
　　"Damages" shall not include:
　　　　a. Taxes, criminal or civil fines, or penalties imposed by law;
　　　　b. Punitive or exemplary damages or any multiplied damage award in excess of the amount so multiplied;
　　　　c. Any amounts which the insured is obligated to pay as a result of a "claim" seeking relief or redress in any form other than monetary damages; or
　　　　d. Any matter deemed uninsurable under the law pursuant to which this Coverage Part shall be construed.

9. "Property damage" means:

a. Injury or damage, of any nature, to tangible or intangible property, including all resulting loss of use of that property; or
b. Loss of or loss of use of tangible or intangible property that is not otherwise injured or damaged.

10. "Suit means a civil proceeding in which "damages" because of a "wrongful act" to which this insurance are alleged. "Suit" includes
a. An arbitration proceeding in which such "damages" are claimed and to which the insured must submit or does submit with our consent;
b. Any other alternative dispute resolution proceeding in which such "damages" are claimed and to which the insured submits with our consent; or
c. An appeal of a civil proceeding . . . .

11. "Wrongful act" means any actual or alleged error, misstatement, misleading statement, act or omission, or neglect or breach of duty by your "directors and officers" in the discharge of their duties as such.

*Id*. at 39–40.

The Policy also specifically applies to all "Directors and Officers" of either entity including the individual Lost Run Defendants. *Id*. at 37.

## II.    <u>LEGAL STANDARD</u>

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007).

In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan*

10

*Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox Cnty. Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

These same standards apply even when each side files a motion for summary judgment. The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Serv., LLC v. Int'l Union of Operating Eng'rs*, 335 F.3d 643, 647 (7th Cir. 2003). The process of taking the facts in the light most favorable to the non-moving party, first for one side and then for the other, may reveal that neither side has enough to prevail without a trial. *Id.* at 648. "With cross-motions, [the Court's] review of the record requires that [the Court] construe all inferences in favor of the party against whom the motion under consideration is made." *O'Regan v. Arb. Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001) (citation and quotation marks omitted).

### III.  <u>DISCUSSION</u>

Under Indiana law, the interpretation of an insurance policy is a pure question of law. *See Erie Ins. Exch. v. Sams*, 20 N.E.3d 182, 187 (Ind. Ct. App. 2014), *trans denied*. The parties agree that there are no issues of material fact precluding summary judgment in this action. Accordingly, summary judgment is proper as the parties disagree only as to the applicability of the Policy.

Cincinnati asserts that the Second Amended Counterclaim does not contain allegations for which it has a duty to defend. Whereas Armour and the Lost Run Defendants argue that the

Amended Counterclaim contains allegations that initiate Cincinnati's duty to defend. The parties dispute two issues which the Court will address in turn: (1) which pleading—between the Amended Counterclaim and the Second Amended Counterclaim—serves as the operative pleading for the purposes of Cincinnati's duty to defend; and (2) whether there was a duty to defend prior to the state court's dismissal of the Garcias' claims other than breach of contract and declaratory judgment.

## A.    <u>**The Operative Pleading**</u>

Cincinnati asserts that although the Garcias asserted a breach of fiduciary duty claim in the Amended Counterclaim, they voluntarily abandoned that claim when they filed the Second Amended Counterclaim which did not contain a similar claim (<u>Filing No. 61 at 12</u>). Cincinnati argues that this is material because the Garcias cannot appeal claims that they voluntarily abandoned. Cincinnati acknowledges the cases which state that claims in a dismissed original complaint are not abandoned for appellate purposes if they do not appear in a subsequently filed amended complaint, *id*. (citing *Scott v. Chuhak & Tecson, P.C.*, 725 F.3d 772, 782 (7th Cir. 2013)), but nonetheless argues that when the state court granted the Garcias request for leave to amend, the Garcias received the relief they sought and thus, forfeited appellate review. *Id*. at 13 (citing *Palka v. City of Chicago*, 662 F.3d 428, 436 (7th Cir. 2011)).

Cincinnati relies on *Atwood v Shelby County Sheriffs' Dept*. for its argument that an original complaint is irrelevant once an amended complaint is filed because the amended complaint completely replaces the original complaint. *Id*. at 12 (citing *Atwood v. Shelby County Sheriffs' Dept.*, No. 1:20-cv-03161, 2021 U.S. Dist. LEXIS 77970, at *4 n.1 (S.D. Ind. April 22, 2021)). Cincinnati also cites *Northfield Ins. Co. v. Loving Home Care, Inc.*, 363 F.3d 523, 529 (5th Cir. 2004), wherein the Fifth Circuit held that a court cannot consider the allegations in the original

complaint when determining whether an insurer has a duty to defend under an amended complaint (Filing No. 61 at 12).

The Lost Run Defendants argue that *Atwood* is inapplicable because that case concerned whether pleadings are allowed to be considered when ruling on motions to dismiss Title 42 U.S.C. violations (Filing No. 63 at 5). They argue that the Fifth Circuit case *Northfield* is also inapplicable because it applied Texas law, which is fundamentally different from Indiana law. They continue that Texas insurance law does not allow courts to look outside the pleadings, whereas Indiana insurance law does. *Id*. (citing cases). The Lost Run Defendants point out that Texas Rule of Civil Procedure 65 provides that amended pleadings completely supersede prior pleadings for purposes of the record in Texas, but Indiana does not have a similar trial rule. *Id*. (citing Tex. R. Civ. P. 65). The Lost Run Defendants note that Cincinnati has failed to cite any Indiana authority holding that under Indiana insurance coverage law, the duty to defend may only be determined by analyzing the most recent complaint. *Id*. In addition, the Lost Run Defendants argue that whether there is any defense or indemnity coverage under Indiana law does not depend on the legal theories in the complaint but rather the facts that give rise to such claims.

The Lost Run Defendants successfully rebut Cincinnati's assertions that the Garcias abandoned their breach of fiduciary duty claims when they filed the Second Amended Counterclaim. They argue persuasively that,

> An insurer is obligated to defend its insured against suits alleging facts that might fall within the coverage of the policy. The first place to look when trying to determine the insurer's duty to defend is the allegations contained within the complaint and from those facts known or ascertainable by the insurer after reasonable investigation.

*Id*. (quoting *Knight v. Ind. Ins. Co.*, 871 N.E.2d 357, 362 (Ind. Ct. App. 2007)). The Lost Run Defendants continue by noting that the Wrongful Acts Coverage section of the Policy defines a

"wrongful act" as "any actual or alleged error, misstatement, misleading statement, act or omission, or neglect or breach of duty by your 'directors and officers' in the discharge of their duties as such." This definition focuses on "acts" rather than legal theories or causes of action, and thus, the facts of a fiduciary nature are carried forward to the Second Amended Counterclaim.

The Court agrees with the Lost Run Defendants that the duty to defend analysis begins under the Amended Counterclaim and Cincinnati is not absolved merely because a Second Amended Counterclaim was filed. As the Lost Run Defendants point out, the duty to defend under Indiana insurance law arises when a suit alleging facts that might fall within the coverage of the policy is filed against the insured and the insured tenders such lawsuit to the insurer. *Knight*, 871 N.E.2d at 362. The specific legal theories, while relevant to the underlying lawsuit, do not bear on the determination of whether an insurer must defend the insured. Accordingly, the Courts analysis will proceed under the Amended Counterclaim because that was the first instance in which the Lost Run Defendants and Armour alleged facts that may fall under the Policy.

**B.    Whether There Was a Duty to Defend Prior to Dismissal of Claims**

The Court must now determine whether the Garcias allegations in the Amended Counterclaim fall within the coverage of the Policy, such that Cincinnati is required to defend the Lost Run Defendants and Armour in the Underlying Lawsuit. The Garcias allege the following counterclaims in their Amended Counterclaim: Count I – Fair Housing Act (42 U.S.C. §§3601 et seq.); Count II – Fair Housing Act (42 U.S.C. § 3604(f)(3)(B)); Count III – Indiana Fair Housing Act; Count IV – Civil Rights Act of 1866 (42 U.S.C. § 1982); Count V – Intentional Infliction of Emotional Distress/Intimidation; Count VI – Breach of Fiduciary Duty, Breach of Duty of Loyalty, Breach of Duty to Act in Good Faith; Count VII – Enforcement of Restrictive Covenants; Count VIII – Breach of Contract; and Count IX – Declaratory Judgment (*see* Filing No. 1-5).

14

"In Indiana, insurance contracts are subject to the same rules of interpretation as other contracts." *Ebert v. Ill. Cas. Co.*, 188 N.E.3d 858, 864 (Ind. 2022). Ordinarily, ambiguous policy provisions will be construed "in favor of the insured, especially if the 'provisions limiting coverage are not clearly and plainly expressed.'" *Id.* (quoting *Meridian Mut. Ins. Co. v. Auto-Owners Ins. Co.*, 698 N.E.2d 770, 773 (Ind. 1998)). However, unambiguous language in a policy is given its plain and ordinary meaning. *Id.* "A policy is unambiguous if reasonable persons cannot honestly differ as to its meaning." *Id.*

Further, "in Indiana, an insurer's 'duty to defend is broader than an insurance company's coverage liability or its duty to indemnify[.]'" *Aluminum Trailer Co. v. Westchester Fire Ins. Co.*, 24 F.4th 1134, 1136 (7th Cir. 2022) (quoting *Seymour Mfg. Co. v. Com. Union Ins. Co.*, 665 N.E.2d 891, 892 (Ind. 1996)). "[A]n insurer has a duty to defend its insured against suits alleging facts that might fall within the coverage." *Id.* (quoting *Fed. Ins. Co. v. Stroh Brewing Co.*, 127 F.3d 563, 566 (7th Cir. 1997) (alteration in original)). "Only if there is no possible factual or legal basis on which the insurer might be obligated to indemnify will the insurer be excused from defending its insured." *Id.* (quoting *City of Gary v. Auto-Owners Ins. Co.*, 116 N.E.3d 1116, 1121 (Ind. Ct. App. 2018)).

The parties separate their arguments on coverage under the Policy into two parts—the CGL coverage and the Wrongful Acts coverage. The Court will address each part of the Policy in turn.

## 1. <u>The Commercial General Liability ("CGL") Coverage</u>

The CGL coverage provides for sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" caused by an "occurrence," which the Policy defines as "an accident." (Filing No. 52-4 at 3). Cincinnati argues that the Garcias' claims in the Underlying Lawsuit are based on the Lost Run Defendants' intentional acts of enforcing

covenants and other restrictions against them with a discriminatory intent and thus, cannot have been accidental (Filing No. 51 at 17).

Cincinnati cites *Jim Barna Log Sys. Midwest, Inc. v. Gen. Cas. Ins. Co. of Wisconsin*, 791 N.E.2d 816, 826 (Ind. Ct. App. 2003) arguing that alleged torts of negligent hiring and conversion were found not to constitute an occurrence and likening the Garcias' allegations to the claims in that case. *Id*. Cincinnati argues that nothing the Garcias have alleged can be construed as accidental; rather, all allegations are that the Lost Run Defendants and Armour committed the acts maliciously and oppressively and with the intent of harming the Garcias.

Cincinnati argues that the Garcias do not allege "bodily injury" or "property damage" within the meaning of the CGL coverage. Rather, the Garcias' allege emotional distress, which does not constitute bodily injury because they fail to allege any bodily touching. *Id*. (citing *State Farm Mut. Auto. Ins. Co. v. D.L.B.*, 881 N.E.2d 665, 666 (Ind. 2008); citing also *Westfield Ins. Co. v. Hill*, 790 F. Supp. 2d 855, 861–62 (N.D. Ind. 2011))). Cincinnati argues that the Garcias also fail to allege "property damage" because they allege purely economic losses as a result of the Lost Run Defendants' and Armour's actions, which is not "property damage" within the meaning of an insurance policy (Filing No. 51 at 18–19 (citing *Amerisure Mut. Ins. Co. v. Microplasics, Inc.*, 622 F.3d 806, 811 (7th Cir. 2010); *Berry Plastics Corp. v. Ill Nat'l Ins. Co.*, 903 F.3d 630, 637 (7th Cir. 2018)).

In response, Armour cites *Auto-Owners Ins. Co. v. Harvey*, 842 N.E.2d 1279 (Ind. 2006) in support of its position that the CGL coverage must be construed to provide it coverage (Filing No. 59 at 12). Armour argues that in *Harvey*, the Indiana Supreme Court dealt with the same issue—having to determine the scope of an "occurrence" under nearly identical policy language. In *Harvey*, the son of the insured pushed his girlfriend, the plaintiffs' daughter, into a river resulting

in the daughter's death. *Id*. at 1281. After the son of the insured pleaded guilty to involuntary manslaughter, the daughter's parents, on behalf of her estate, sued the son for the wrongful death of their daughter. *Id*. When the insured's son tendered the complaint to the insurer, the insurer declined coverage, arguing that the son's conduct was intentional and thus did not constitute an "occurrence," which was defined as "an accident." *Id*. at 1282. The word "accident" was not defined. *Id*. The Indiana Supreme Court stated that an "accident" under Indiana insurance law means "an unexpected happening without an intention or design." *Id*. at 1283 (quoting *Terre Haute First Nat. v. Pacific Employers Ins. Co.*, 634 N.E.2d 1336, 1338 (Ind. Ct. App. 1993)). Finding that the term "accident" or "occurrence" was ambiguous and should be construed strictly against the insurer and the policy viewed from the insured's standpoint, the Indiana Supreme Court concluded that the daughter's drowning fell within the scope of an "occurrence" because the son did not intend for her to drown even though his pushing was intentional. *Id*. at 1285–1286.

Armour argues that *Harvey* controls here because the conduct alleged by the Garcias entails the Lost Run Farm's attempts to secure the Garcias' compliance with the neighborhood covenants. (Filing No. 59 at 15). Armour concedes that such attempts were intentional, however, it argues that the resulting harm—the lost use of the Garcias' property—was unexpected as a matter of law. Armour contends that holding otherwise would mean that any enforcement of the covenants would be intended to result in property damage, which cannot be true. *Id*. at 16.

The Lost Run Defendants argue that the CGL coverage applies because it defines "property damage" as the "[l]oss of use of tangible property that is not physically injured," and the Garcias Amended Counterclaim specifically alleges, "[a]s a result of the [Lost Run Defendants' and Armour's] unlawful acts, the Garcias suffered a violation of their civil rights, loss of the use and enjoyment of their property, and emotional distress." (Filing No. 57 at 24). The Lost Run

Defendants also cite *Harvey*, 842 N.E.2d at 1285 for the proposition that even an intentional act can constitute an "occurrence" if the resulting damage was not intended or expected (Filing No. 57 at 25). Lastly, the Lost Run Defendants join in the arguments asserted above by Armour.

The Court is not persuaded and finds that the CGL coverage does not apply. First, the Garcias clearly allege "property damage" within the meaning of the CGL coverage. The CGL coverage defines "property damage" as "physical injury to tangible property, including all resulting loss of use of that property" or "loss of use of tangible property that is not physically injured." (Filing No. 52-4 at 18). The Garcias specifically allege that "[a]s a result of the [Lost Run Defendants' and Armour's] unlawful acts, the Garcias suffered a violation of their civil rights, *loss of the use and enjoyment of their property*, and emotional distress." (Filing No. 56-6 at 21 ¶102 (emphasis added)). Accordingly, the only question under the CGL coverage is whether the Garcias allegations in the Amended Counterclaim constitute an "occurrence." The Court finds that they do not.

In *Harvey,* the Indiana Supreme Court held that an intentional act may constitute an "occurrence" if the resulting damage was not intended. 842 N.E.2d at 1285. However, the Garcias' alleged that the resulting harm was intended. The Garcias specifically alleged that the unlawful acts and enforcement of the restrictive covenants were done with discriminatory and malicious intent and to cause emotional distress and intimidation (Filing No. 56-6 at 27–29). While such allegations do not explicitly reference an intent to cause the loss of use of the Garcias' property, the allegations are certainly akin to harassing, delaying, or thwarting the Garcias ability to use the property as they wished.

Moreover, this action is distinguishable from *Harvey* because *Harvey* involved an instance of specific personal physical conduct. The Indiana Supreme Court contrasted *Harvey* from cases

involving claims based on commercial or professional conduct such as the case here. 842 N.E.2d at 1284 (citing *Transamerica Ins. Serv. v. Kopko*, 570 N.E.2d 1283, 1284–85 (Ind. 1991) (holding that a liability policy's "occurrence" requirement, which was defined to require an "accident," did not cover a claim against an insured home builder by the home purchaser claiming the house had settled due to the instability of the sub-soil); *Erie Ins. Co. v. Am. Painting Co.*, 678 N.E.2d 844, 845–46 (Ind. Ct. App. 1997) (finding a claim of negligent hiring and retaining of a painter who allegedly burglarized a home did not arise from an accident, and thus was not an occurrence covered under the liability insurance contract); *R.N. Thompson & Assoc. v. Monroe Guar. Ins. Co.*, 686 N.E.2d 160, 164–65 (Ind. Ct. App. 1997) (finding economic losses arising from inadequate materials and substandard construction work were not an accident or occurrence); *Terre Haute First Nat'l Bank*, 634 N.E.2d at 1338 (finding a claim for the bank's negligence and breach of fiduciary duty in acting as plaintiff's guardian was not covered as an accident or occurrence under a liability insurance policy); *City of Muncie v. United Nat'l Ins. Co.*, 564 N.E.2d 979, 982 (Ind. Ct. App. 1991) (affirming summary judgment for a liability insurer where the insured asserted that an action for the wrongful discharge of employees was covered as an "occurrence," which was defined as conduct of an insured that results in harm "neither expected nor intended")). The courts in those cases found no occurrence. *See id*.

This case is more akin to *Jim Barna*, where the Indiana Court of Appeals found that negligent hiring of a home builder by a distributor of log home packages did not constitute an occurrence because even if the distributor did not intend for the harm the builder caused to the home, they intended to hire the builder. 791 N.E.2d at 826. Here, the Lost Run Defendants and Armour intended to restrict the Garcias' use of their property when they enforced the restrictive covenants. The Lost Run Defendants argue this finding ignores that under Indiana law "[r]estrictive

covenants serve . . . to maintain or enhance the value of land by controlling the nature and use of lands subject to a covenant's provisions." (Filing No. 63 at 4 (quoting *Hamilton v. Schaefer Lake Lot Owners Ass'n, Inc.*, 59 N.E.3d 1051, 1054 (Ind. Ct. App. 2016)). Though the general purpose of restrictive covenants is to enhance the value of land, the intent is still to restrict the use of the property. Consequently, whether the Lost Run Defendants and Armour specifically intended to cause a loss or increase of the property value is irrelevant because the act of restricting the Garcias use of their property was intentional.

Finally, Armour argues if the Court finds that the act of enforcing the restrictive covenants was intentional, the Court is essentially finding that any enforcement of restrictive covenants "will necessarily result in property damage." (Filing No. 59 at 16). This is not so. In holding as it does in this Order, the Court does not aver that the enforcement of restrictive covenants is intended to result in loss. Rather, the intent is in the action of enforcing the restrictive covenants irrespective of whether such enforcement ultimately results in a loss or gain. Such a finding is consistent with the various Indiana cases judging the scope of an "occurrence" based on commercial or professional conduct—as is the case here—rather than based on specific personal physical conduct. *See Harvey*, 842 N.E.2d at 1284 (citing cases). That said, the Court finds that the act of enforcing the restrictive covenants was intentional and thus, not an "occurrence" within the meaning of the CGL coverage. Consequently, there is no coverage, and therefore, no duty to defend under the CGL portion of the Policy.

### 2. **The Wrongful Acts Coverage**

The Wrongful Acts Coverage excludes any liability based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving an insured's deliberately fraudulent, dishonest, criminal or malicious act or omission, or willful or reckless violation of any

statute, rule, regulation, agreement, or judicial or regulatory order (Filing No. 52-4 at 35-37). The Wrongful Acts coverage of the Policy defines a "wrongful act" as any actual or alleged error, misstatement, misleading statement, act or omission, or neglect or breach of duty by your "directors and officers" in the discharge of their duties as such. *Id*. at 40.

Cincinnati asserts five reasons why the Wrongful Acts coverage exclusions bar coverage for the Garcias' claims (Filing No. 51 at 27–30). First, the Wrongful Acts coverage excludes any liability based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving an insured's deliberately fraudulent, dishonest, criminal or malicious act or omission, or willful or reckless violation of any statute, rule, regulation, agreement, or judicial or regulatory order. *Id*. at 28. Cincinnati contends that the Garcias' claims are based on discriminatory conduct committed with an intentional, discriminatory motive, therefore, the exclusion applies. Specifically, because the Garcias assert that the Lost Run Defendants' and Armour's conduct was malicious and intentionally violated Indiana's civil rights laws, coverage is barred. Accordingly, Cincinnati contends that the exclusion bars coverage for Count I – Fair Housing Act §§3601 et seq.; Count II – Fair Housing Act § 3604(f)(3)(B)); Count III – Indiana Fair Housing Act; Count IV – Civil Rights Act of 1866; and Count V – Intentional Infliction of Emotional Distress/Intimidation. *Id*.

Second, Cincinnati argues the Wrongful Acts coverage excludes any liability based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving violations of any civil rights law whether Federal or State or local ordinance, including but not limited to discrimination on account of race, religion, sex, or age. Cincinnati thus contends that the Garcias' discrimination claims—Counts I and II—are barred from coverage. *Id*.

Third, Cincinnati contends that the Wrongful Acts coverage excludes liability based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving bodily injury, which includes mental anguish or emotional distress. Cincinnati asserts that this bars coverage for the Garcias' Count V – Intentional Infliction of Emotional Distress/Intimidation. *Id*. at 29.

Fourth, Cincinnati argues that the Wrongful Acts coverage excludes liability based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving abuse of process. Cincinnati asserts that this exclusion applies to the Garcias' claim of abuse of process, a claim later added in the Second Amended Counterclaim.

Fifth and finally, Cincinnati contends that the Garcias' claims to enforce restrictive covenants against other homeowners and their claim for declaratory judgment—Counts VII and IX—are equitable in nature and do not fall within the definition of a "wrongful act," as they are not based on actions taken as "directors or officers," of the Lost Run Defendants, but rather as individual homeowners. Cincinnati further argues that the damages the Garcias seek are not covered as the Wrongful Acts coverage excludes any amounts in any form other than monetary damages. *Id*. at 29.

In Response, the Lost Run Defendants argue that Cincinnati is mistaken in their assumption that because the Garcias' Amended Counterclaim included alleged violations of civil rights laws, all of the allegations are excluded from coverage (Filing No. 57 at 21). The Lost Run Defendants continue that the Garcias' claim for breach of fiduciary duty—Count VI—satisfies the definition of a wrongful act and is not excluded from coverage. They add that it is incorrect to say that the breach of fiduciary duty allegations arose from civil rights violations or any dishonest, criminal, or malicious acts because the Garcias do not need to prove any civil rights violation or any

dishonest, criminal, or malicious acts to succeed on their breach of fiduciary duty claim. The Lost Run Defendants assert that, conversely, just because the Garcias have alleged some acts that may constitute intentional, discriminatory, dishonest, criminal, or malicious acts does not mean that it was not possible for there to be potential liability for allegations of a "wrongful act" constituting a breach of fiduciary duty that was not intentional, discriminatory, dishonest, criminal, or malicious. *Id*. at 22. The Court disagrees.

Cincinnati implicitly concedes that the Garcias' allegations fall within the Wrongful Acts coverage, as it makes no attempt to argue otherwise. The Court agrees with the Defendants that Count VI: Breach of Fiduciary Duty of the Amended Counterclaim clearly falls within the definition of a "wrongful act" under the Wrongful Acts coverage and thus, unless it is excluded, the Wrongful Acts coverage shall apply. Upon review, the  Court concludes that exclusion "g. Dishonest, Criminal or Malicious Acts" applies.

The exclusion excludes coverage for the following: "Any insured or any person for whose actions an insured is legally responsible, committing any deliberately fraudulent, dishonest, criminal or malicious act or omission, or willful or reckless violation of any statute, rule, regulation, agreement, or judicial or regulatory order." (Filing No. 52-4 at 36). The Garcias allege that the Lost Run Defendants and Armour breached their fiduciary duties by enforcing the restrictive covenants in the following ways: (1) doing so based on discrimination and malice; (2) doing so in a selective and self-serving fashion; (3) by failing to deal fairly, honestly, and openly with the Garcias; and (4) doing so while having a conflict of interest due to their own violations of the restrictive covenants (Filing No. 56-6 at 27 ¶¶130–133). All of these allegations fall within the exclusion of deliberate dishonest acts or omissions. Indeed, it is difficult to imagine a situation

in which any of these allegations would not be considered allegations of dishonest acts or omissions, especially given that among them are explicit allegations of malice and dishonesty.

Though the Lost Run Defendants argue that the Garcia would not need to prove any dishonest acts to succeed on their claims, the Lost Run Defendants provide no authority for their assertions. It is true that under Indiana law, a dishonest act or omission is not expressly required for a breach of fiduciary duty claim. *See Rapkin Group, Inc. v. Cardinal Ventures, Inc.*, 29 N.E.3d 752, 757 (Ind. Ct. App. 2015) ("[A] claim for breach of fiduciary duty requires proof of three elements: (1) the existence of a fiduciary relationship; (2) a breach of that duty owed by the fiduciary to the beneficiary; and (3) harm to the beneficiary."). However, it stands to reason that an allegation of a breach of a fiduciary duty based on a dishonest act or omission requires proof of the dishonest act or omission. For example, to succeed on their claim, the Garcias must prove that the Lost Run Defendants and Armour breached their duty by enforcing the restrictive covenants based on discrimination and malice, doing so in a selective and self-serving fashion, doing so unfairly or dishonestly, or doing so while necessarily omitting their conflict of interest. Accordingly, exclusion g. Dishonest, Criminal or Malicious Acts applies to the Garcias claim of a breach of fiduciary duty.

Moreover, the parties do not contend that any other of the Garcias' claims meet the definition of a "wrongful act" within the meaning of the Wrongful Acts coverage. Consequently, there is no coverage under the Wrongful Acts part of the Policy.

Finally, the only claim asserted in the Second Amended Counterclaim not contained in the Amended Complaint was a claim for abuse of process (*see* Filing No. 52-1 at 16). The Policy explicitly excludes coverage for "[a]ny actual or alleged . . . abuse of process." (Filing No. 52-4 at

35 §2(c)(3)). Accordingly, there is no coverage under the Policy for the Garcias' claims of abuse of process.

Because the Court concludes that no coverage exists under the CGL coverage and finds that no coverage exists under the Wrongful Acts coverage, Cincinnati has no duty to defend the Lost Run Defendants or Armour pursuant to the Policy. Accordingly, Cincinnati's Motion for Summary Judgment is **granted**, the Lost Run Defendants' Cross-Motion for Summary Judgment is **denied**, and Armour's Cross-Motion for Summary Judgment is **denied**.

**C.    Remaining Claims against Defendants John and Mary Kay Garcia**

As  final matter, the Court declines to enter final judgment in this action because claims against the Garcias remain pending**.** Cincinnati named the Garcias as defendants in this action, and issued a summons (Filing No. 26).  However, the docket does not reflect that service was perfected and the Garcias have not appeared. Because the Garcias have not answered or filed a motion for summary judgment, Cincinnati may move to dismiss its claims against them under Rule 41(a)(1); or if it intends to pursue its claims against them, must take appropriate actions promptly. Because this matter is scheduled for final pretrial conference on February 11, 2026 and trial on March 9, 2026, Cincinnati is Ordered to file **Notice** of how it intends to proceed concerning the Garcias, by no later than **January 13, 2026**.

**IV.    <u>CONCLUSION</u>**

For the reasons stated above, Cincinnati's Motion for Summary Judgment (Filing No. 50) is **GRANTED**. The Lost Run Defendants' Cross-Motion for Summary Judgment (Filing No. 55) is **DENIED**, and Armour's Cross-Motion for Summary Judgment (Filing No. 58) is **DENIED**.

The Court declares that Cincinnati had no duty to defend either the Lost Run Defendants or Armour under the Policy in the Underlying Lawsuit filed by the Garcias. Because there is no

duty to defend any of the Garcias' claims there is no duty to indemnify any of the Defendants. *Dave's Detailing, Inc. v. Catlin Ins., Co*., 13 F.Supp.3d 935, 944 (S.D. Ind. 2014) (stating "and insurer who has no duty to defend has no duty to indemnify its insured either."). Declaratory Judgment will issue in a separate Order.

Because the claims against the Garcias remain pending, no partial final judgment will issue at this time. Cincinnati shall provide Notice concerning its intent concerning the claims against the Garcias by no later than **January 13, 2026.**

**SO ORDERED**.

Date:   1/6/2026

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution:

Dennis F. Cantrell
Stoll Keenon Ogden PLLC
dennis.cantrell@skofirm.com

Justin G. Hazlett
Wilson Elser
justin.hazlett@wilsonelser.com

Dane Andrew Mize
SKILES DETRUDE
dmize@skilesdetrude.com